IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-01490-RM-MJW

BRYAN KOENIG,

Plaintiff,

v.

TERRY E. THURMSTON, in their individual capacity,
JENNENE SCOTT, in their individual capacity, and
JODI GERMANO, in their individual capacity,

Defendants.

---

**RECOMMENDATION ON
DEFENDANT GERMANO'S MOTION TO DISMISS PLAINTIFF'S AMENDED
COMPLAINT AND JURY DEMAND (Doc. 30) PURSUANT TO FED.R.CIV.P. 12(b)(6)
(Docket No. 38)
and
CITY DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT
(Docket No. 39)**

---

**MICHAEL J. WATANABE
United States Magistrate Judge**

This case was referred to this court pursuant to an Order Referring Case entered by Judge Raymond P. Moore on July 24, 2014 (Docket No. 11).

**PLAINTIFF'S CLAIMS**

Plaintiff, Bryan Koenig, through counsel, alleges the following in the First Amended Complaint (Docket No. 30), which is brought pursuant to 42 U.S.C. §§ 1983, 1985, and 1988. Plaintiff was a member of the U.S. Army, residing in El Paso County. Defendants Terry E. Thurmston and Jennene Scott were police officers for the City of Colorado Springs, and defendant Jodi Germano was a social worker for El Paso

County.  The two police officers colluded with Germano in preparing an Arrest Warrant and making an unreasonable seizure of the plaintiff, violating his Fourth and Fourteenth Amendment rights.  On April 17, 2012, Thurmston, aided and abetted by the other two defendants, presented an Arrest Warrant to County Court Judge Douglas Miles, who "signed the search [sic] warrant for the arrest of the Plaintiff, Bryan Koenig."  (Docket No. 30 at 2, ¶ 4).  A copy of that Arrest Warrant, as well as the Application and Affidavit for Arrest Warrant, are attached to and incorporated by reference into the Amended Complaint.  (Docket No. 30 at 5-14).  The Arrest Warrant lists two counts of child abuse resulting in serious bodily injury - § 18-6-401(1)(A), (7)(A)(III), C.R.S. (a class three felony), and two counts of child abuse resulting in serious bodily injury - § 18-6-401(1)(A), (7)(A)(IV) (a class four felony).  (Docket No. 30 at 14).

Plaintiff was in the United States when the Arrest Warrant was signed, but he was deployed to Kuwait during the alleged abuse.  "[T]he arrest warrant was devoid of probable cause, so that any reasonable police officer examining the warrant would know that probable cause was lacking for the arrest of Plaintiff Koenig, all in violation of the Plaintiff's rights, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution."  (Docket No. 30 at 2, ¶ 7).

The Affidavit was prepared by Thurmston, with the help of the other two defendants.  That Affidavit contained many statements that were in reckless disregard of the truth, and those statements should be stricken from the Affidavit.  Those statements included:

> In paragraph 4, of page 2 of the affidavit, the statement is incomplete, and Plaintiff Koenig explained to Officer Scott that the Skype picture only showed the girl's faces and was very grainy, making the

> communication not much more than a telephone call.
>
> In paragraph 5, of page 2, Mr. Koenig did not say to Officer Scott that he had been aware of problems between [his daughters] Coryn, Chloe, and his wife since he had been deployed.
>
> That on page 6, paragraph 2, that was a search of the girls [sic] room.
>
> There was never a search. . . .

(Docket No. 30 at 3, ¶ 9).

As a result of defendants' actions, plaintiff lost his position in the military; suffered lost wages; will continue to suffer lost wages, retirement benefits, and healthcare; and has suffered mental pain and suffering and other damages.  There is no mention in the pleading about the disposition of the criminal charges.

**DEFENDANTS' MOTIONS TO DISMISS**

Now before the court for a report and recommendation are the following two motions:  Defendant Germano's Motion to Dismiss Plaintiff's Amended Complaint and Jury Demand (Doc. 30) Pursuant to Fed.R.Civ.P. 12(b)(6) (Docket No. 38) and the City Defendants' [ ] Motion to Dismiss First Amended Complaint (Docket No. 39).  With leave of court (see Docket No. 48), plaintiff filed a combined Response to the motions (Docket No. 46).  Defendant Germano and the State Defendants filed replies in support of their motions (Docket Nos. 49 and 50).  The court has very carefully considered these motion papers as well as applicable Federal Rules of Civil Procedure and case law.  In addition, the court has taken judicial notice of the court file.  The court now being fully informed makes the following findings, conclusions of law, and recommendation that both motions be granted.

4

Defendant Germano seeks dismissal of the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) on the following grounds: (1) the Warrant for plaintiff's arrest was supported by probable cause because the Affidavit established a substantial probability that a crime had been committed by the plaintiff; (2) regardless of whether the Warrant was supported by probable cause, plaintiff has failed to plead personal participation on the part of Germano; (3) plaintiff fails to state a claim against Germano for alleged violations of 42 U.S.C. § 1985; and (4) even assuming, arguendo, that the Amended Complaint can be construed to have pled some claim against Germano, qualified immunity shields her from liability.  The City Defendants [defendants Thurmston and Scott] seek dismissal pursuant to Fed. R. Civ. P. 12(b)(6) on the following grounds: (1) plaintiff's factual allegations fail to demonstrate that the Affidavit for Arrest Warrant lacks probable cause; (2) plaintiff has failed to allege any facts establishing a conspiracy; and (3) plaintiff has failed to establish the essential element of personal participation for defendant Scott.

Under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A motion to dismiss pursuant to Rule 12(b)(6) alleges that the complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  "The Court's function on a Rule 12(b)(6) motion . . . is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is sufficient to plausibly state a claim." Spring Creek Exploration & Prod. Co., LLC v. Hess Bakken Investment II, LLC, 2014 WL 4400764, at *2 (D. Colo. Sept. 5, 2014).  "A complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) if it does not plead 'enough facts to state a claim to

relief that is plausible on its face.'" Cutter v. RailAmerica, Inc., 2008 WL 163016, at *2 (D. Colo. Jan. 15, 2008) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." Twombly, 550 U.S. at 555 (citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." Id. "[A] plaintiff must 'nudge [] [his] claims across the line from conceivable to plausible' in order to survive a motion to dismiss. . . . Thus, the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting Twombly, 127 S. Ct. at 1974).

The Tenth Circuit Court of Appeals has held "that plausibility refers 'to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" Khalik v. United Air Lines, 671 F.3d 1188, 1191 (10th Cir. 2012). The Circuit court has further "noted that '[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context.'" Id. The court thus "concluded the *Twombly/Iqbal* standard is 'a wide middle ground between heightened fact pleading, which is expressly rejected, and allowing complaints that are no more than labels and conclusions or a formulaic recitation of the

elements of a cause of action, which the Court stated will not do.'" Id.

For purposes of a motion to dismiss pursuant to Rule 12(b)(6), the court must accept all well-pled factual allegations in the complaint as true and resolve all reasonable inferences in the plaintiff's favor. Morse v. Regents of the Univ. of Colo., 154 F.3d 1124, 1126-27 (10th Cir. 1998); Seamons v. Snow, 84 F.3d 1226, 1231-32 (10th Cir. 1996). However, "when legal conclusions are involved in the complaint 'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to [those] conclusions' . . . ." Khalik, 671 F.3d at 1190 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009)). "Accordingly, in examining a complaint under Rule 12(b)(6), [the court] will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." Id. at 1191.

A court generally considers only the contents of the Complaint when ruling on a motion to dismiss brought pursuant to Rule 12(b)(6). Gee v. Pacheco, 627 F.3d 1178, 1186 (10th Cir. 2010). "Exceptions to this general rule include: documents incorporated by reference in the complaint; documents referred to in and central to the complaint, when no party disputes their authenticity; and 'matters of which a court may take judicial notice.'" Henson v. Bank of Am., 935 F. Supp.2d 1128, 1136 (D. Colo. 2013) (quoting Gee, 627 F.3d at 1186). "If a plaintiff does not incorporate by reference or attach a document to its complaint, a defendant may submit an undisputably authentic copy which may be considered in ruling on a motion to dismiss." Id. Here, attached to the Amended Complaint as exhibits and incorporated by reference in the Amended Complaint are the Application and Affidavit for Arrest Warrant (Docket No. 27-2) and the

Arrest Warrant (Docket No. 27-3).

**Probable Cause.** "An individual who is arrested pursuant to a warrant may challenge the probable cause determination underlying the issuance of the warrant." Berry v. City of Montrose, 2014 WL 959334, at *4 (D. Colo. Mar. 12, 2014) (citing Wilkins v. DeReyes, 528 F.3d 790, 797 n.4 (10th Cir. 2008)). "Probable cause for an arrest warrant is established by demonstrating a substantial probability that a crime has been committed and that a specific individual committed the crime." Wolford v. Lasater, 78 F.3d 484, 489 (10th Cir. 1996). "Affiants seeking arrest warrants violate the Fourth Amendment when they knowingly, or with reckless disregard for the truth, include false statements in an affidavit, or knowingly or recklessly omit from it information which, if included, would vitiate probable cause." Berry v. City of Montrose, 2014 WL 959334, at *5 (citing Wolford, 78 F.3d at 489). "If 'hypothetically correcting' an alleged misrepresentation or omission in an arrest warrant affidavit 'would not alter the determination of probable cause, the misconduct was not of constitutional significance and is not actionable under § 1983.'" Id. at *4 (quoting Grubbs v. Bailes, 445 F.3d 1275, 1278 (10th Cir. 2006)).

Here, the crimes stated in the Arrest Warrant were two counts of child abuse resulting in serious bodily injury - § 18-6-401(1)(A), (7)(A)(III), C.R.S. (a class three felony), and two counts of child abuse resulting in serious bodily injury - § 18-6-401(1)(A), (7)(A)(IV) (a class four felony) (Docket No. 30 at 14). At the time the Arrest Warrant was issued,

> (1)(a) A person commits child abuse if such person causes an injury

8

>to a child's life or health, or permits a child to be unreasonably placed in a situation that poses a threat of injury to the child's life or health, or engages in a continued pattern of conduct that results in malnourishment, lack of proper medical care, cruel punishment, mistreatment, or accumulation of injuries that ultimately results in the death of a child or serious bodily injury to a child.
>
> . . .
>
> (7)(a) Where death or injury results, the following shall apply:
>
> . . .
>
> (III) When a person acts knowingly or recklessly and the child abuse results in serious bodily injury to the child, it is a class 4 felony.
>
> (IV) When a person acts with criminal negligence and the child abuse results in serious bodily injury to the child, it is a class 4 felony. . . .

¶18-6-401, C.R.S.

Applying the procedure in <u>Wolford</u> for how the court should address potentially defective warrants, setting aside the information plaintiff alleges in the Amended Complaint was false and including the information plaintiff alleges was omitted, this court finds that a reasonably prudent officer faced with this evidence could still find a substantial probability that plaintiff committed the crimes alleged.

The Affidavit in support of the Arrest Warrant included the following averments concerning plaintiff. On August 19, 2011, staff at his daughters' school contacted the School Resource Officer regarding a welfare check of the daughters (ages 11 and 13). That Resource Officer learned that the father, plaintiff here, had removed his two daughters from school at 1:00 p.m. that day. The El Paso County of Department of Human Services ("EPCDHS") was contacted by the school and arranged for the plaintiff to take the girls to Evans Hospital at Fort Carson for

treatment.  EPCDHS Caseworker Jodi Germano, a defendant here, responded to the hospital and contacted the staff, Pediatric Physician LT. Julie Tullberg, who treated the daughters for extreme malnutrition.  Germano obtained an emergency protection order through the El Paso County Court, Magistrate Lynn Billings, to remove the two children from the family home and the care of their father, plaintiff here, and step-mother (Ms. Koenig).  Germano placed the girls into foster care.

The following day, on Saturday, August 20, 2011, defendant officer Jennene Scott was assigned follow-up on the investigation.  She contacted Germano by phone and was provided information of how EPCDHS had become involved.  Germano advised she was told Ms. Koenig was withholding food as punishment when the girls were bad.  In addition, Germano reported that the plaintiff had been deployed with the U.S. Army since January 2011 and returned approximately three days earlier for fourteen days of rest and relaxation.  Ms. Koenig had been the sole supervision for the children and a third child, age three, who is the biological daughter of Ms. Koenig and plaintiff.  The three year old daughter was well fed, allowed regular meals, and treats.  Scott researched previous calls to the home and learned that on July 18, 2011, Officer Hallman had responded to check the welfare of two juveniles who reportedly spent all day outside regardless of weather and told the reporting party, Bobby Price, they were not allowed in the house.  Officer Hallman contacted Ms. Koenig who reported the girls were permitted in the house when they wanted and were eating a snack when Officer Hallman arrived.  Officer Hallman indicated there was food in the home and the children appeared safe.

10

On August 20, 2011, at approximately 2:00 p.m., Germano, Officer Michelle Nethercot, and Officer Scott responded to the plaintiff's home and contacted plaintiff and Ms. Koenig. During this visit plaintiff and Officer Scott talked, during which time plaintiff reported he had been deployed since January 2011, had come home on Sunday, August 14, 2011, at approximately 9:30 p.m. for a fifteen-day leave. He reported that since he had been deployed, he had contacted his family via a Skype account a couple of times a month or more. He explained he had been aware of the problems between his two older daughters and Ms. Koenig since he has been deployed. He was aware the girls were stealing chocolate, lying to his wife, and refusing to do their chores or follow the rules of the home. He knew the children had been punished for their actions by having to pick weeds. He reported both he and his wife have always disciplined the children, but since he has been gone, it had fallen to his wife to handle. In addition, he reported the girls have chores like taking out the trash, cleaning their bathroom, pulling weeds, and cleaning their sister's bathroom. If they did not do their chores, they would be punished, sometimes just to remind them, but other times it required either he or his wife to yell at them, spank them with a plastic spoon or their hand, or not permit them doughnuts or candy. He stated his children refuse to ask for food and therefore they do not get food unless they ask. He said they are not permitted to help themselves to food unless they have asked permission first. If they do not ask permission, he said they would be punished. He said his wife will withhold food, and he does not necessarily agree with that, but those choices are hers. He then stated that he does not want to take sides and knows no one is completely right or

wrong in this situation. He stated feeding the girls oatmeal as their only meal was his wife's doing, and he was not involved in that.

Plaintiff further stated that when he returned on Sunday night, August 14, 2011, he immediately noticed the girls' weight loss, but the weight loss was not explained, and he did not question it further. He reported he had not sought medical attention for them when he came home; he had just started them on an improved diet. He also reported that someone at the school called EPCDHS, and Germano had called him and told him he had to take the girls to the hospital immediately. He signed them out of school and took them to Evans Army Hospital.

Ms. Koenig stated during the time plaintiff was deployed, the girls talked to him via Skype. He would call once a week or sometimes as much as three times a week, for about a half hour at a time.

Both girls were examined at the hospital by Dr. Julie Tullberg, a pediatric physician. She stated the girls had been examined in February 2011 for a well child visit and were healthy, but when she examined them on Friday, August 19, 2011, both girls had lost significant weight. Because of the low weights, they had fallen off the growth chart for their age, and the doctor reported this was serious bodily injury and could result in the protracted loss or impairment of the function of any part or organ of the body. The doctor noted the following with respect to the younger daughter. She had a 1- to 2-week old contusion on her buttocks, which the girl reported was from being spanked with a plastic or wooden spoon. The doctor reported the outline of the bruise was consistent in her opinion with being struck by a spoon. Hospital records indicated that she was 56.2 inches tall and

weighed 65 lb, 4.2 oz., which provide a Body Mass Index of 14.5, which was below the healthy standard.

Dr. Tullberg reported that the older daughter was concerned because she had not developed breasts like her friends, and the doctor confirmed that the girl had not started puberty. The doctor stated she cannot say if the girl is under her normal development because some children develop later than others, but it is possible the lack of nutrition contributed to her slower development. Hospital records indicated that the girl was 60 inches tall and weighed 74 pounds, which provided a Body Mass Index of 14.6, below 18 BMI normally suggested as healthy.

Dr. Tullberg completed the Colorado Springs Police Department Extent of Injury Form on which she wrote on both, "Patient was only fed oatmeal this summer as form of discipline. Wt. loss of 7 (10) lbs since Feb. Concern for long term consequences of malnutrition and decreased body mass."

Thurmston and two Investigative Specialists scheduled interviews with the two girls. One of the Investigative Specialists asked the older girl what types of things her dad would do before he left when she got in trouble with him. She stated he would beat her, make them do pushups, ground them, take their toys away, and they were not allowed to have snacks or anything. She said her sister would ask for a snack to take to school, and her dad would allow her only to take a carrot because "she didn't deserve anything else." She said her sister does not like carrots, but she eats them because she is hungry. She was asked what she meant by her dad beating her, and she explained that he had a white plastic spoon and would pull down their pants and "whip" them on their butts. She then talked

13

about an incident in which she and her sister had taken candy from a store and was caught by their step-mother. When the girls got home, her step-mother had told her dad via Skype what had happened, and he made the step-mother take that spoon and "whack" their knuckles five times on each hand as hard as she could. She described her dad would usually hit them twice on the bottom, but if they were really bad, he would make them pick a number and get hit that many times. When asked, she said they "always" left marks. Investigative Specialist Pitchford asked her if her dad ever hit her anyplace else on her body, and she stated he would backslap both her and her sister on the face and arms. She stated her dad would smack her and her sister's face or their shoulders as hard as he could.

    The older sister also said that when her dad was home, they would always get oatmeal, and when they were good, they would have regular meals. When asked what she would eat on a day when she was in trouble, she stated she would eat oatmeal for breakfast, lunch, and dinner, and was given two scoops. She said they were supposed to get three scoops, but she got only two. She said they had to make their own oatmeal. She said when her dad got back, he noticed they were too skinny and was afraid he would get in trouble, so he bought regular food and made them drink milk. She was asked how many days of the week she thought she was eating oatmeal before her dad was deployed, and she stated it depended how good they were; sometimes it was every day, and sometimes they would get regular food once a week or peanut butter and jelly. She also stated they had to sneak food from the storage area, and her dad and step-mom eventually noticed, so a lock was put on the door. Her dad and step-mom would search her and her

sister's bedrooms for stuff they were not supposed to have, and if they found something, they would get in trouble. In addition, she was asked if her dad ever told her step-mom to stop, and she said he had confronted her step-mom about yelling at them and telling them how bad they were all the time, but her step-mom told him she did not care because they "were bad."

Investigative Specialist Predinger spoke with the younger daughter. She said before her father was deployed, sometimes she could eat only oatmeal for up to three weeks at a time. Her parents would eat regular food while she ate oatmeal. Her older sister got in trouble for saying it was unfair. When they went to pick their dad up, they got to eat peanut butter and jelly, and when her father saw her, he thought she was really skinny, and he started making them drink special milk. Both her father and step-mother would have them do "PT," which she described as her and her sister having to do the "roman chair" which was standing in a squatting position for five to fifteen minutes, the "frog" which was sitting on the ground holding the body up with the arms and lunging the legs forward, and then flutter kicks which was laying down on the ground and then having to flutter the legs six inches off the ground. PT was both her father's and step-mother's idea of punishment. She was not allowed to drink anything when she was doing the PT exercises; they had to wait until they were done to have water. Her dad was sometimes there when they had to do PT for punishment. Another form of punishment was being spanked on their bare butt by their father who used a plastic white spoon. She got hit on her butt more, and her sister got hit with the spoon more on her head. She denied that her father ever left marks on her.

15

The court finds that there were sufficient facts in the affidavit to establish the requisite probable cause that the plaintiff caused an injury to a child's life or health, or permitted a child to be unreasonably placed in a situation that posed a threat of injury to the child's life or health, or engaged in a continued pattern of conduct that resulted in malnourishment, lack of proper medical care, cruel punishment, mistreatment, or accumulation of injuries that ultimately resulted in serious bodily injury to a child.  The malnutrition and mistreatment plaintiff committed and permitted resulted in serious bodily injury, as stated by Dr. Tullberg.  The affidavit avers that plaintiff knew that as a form of punishment, his wife was not feeding the two children.  Moreover, plaintiff himself disciplined the children prior to his deployment, and such discipline also included only feeding them oatmeal, sometimes for weeks at a time.  Plaintiff also stated that the children would not be fed unless they asked for food.  Furthermore, plaintiff himself stated that if the children did not do their chores, they would be punished.  According to the children, the punishments by the father including striking them with a plastic spoon, sometimes many times; backslapping them across their faces, arms, and shoulders; and requiring them to do "PT" during which they were not allowed to have any water.  In addition, plaintiff communicated with his family via Skype during his deployment.  While he claims that the Skype picture was very grainy and not much more than a telephone call, plaintiff was told during one of these communications that the children had taken candy, and plaintiff instructed his wife to strike their knuckles with a spoon five times on each hand as hard as she could.  Even after plaintiff returned from deployment, he did not obtain medical care for the

children, even after noticing how thin they were. The children only obtained medical intervention following a report by school staff.

The court further finds that because probable cause existed based upon the uncontested facts in the affidavit, the three issues plaintiff raises in his pleading regarding the Affidavit are irrelevant. Inasmuch as there was probable cause to believe that plaintiff committed the crimes stated in the Warrant, its issuance did not contravene the Fourth and Fourteenth Amendments. Therefore, the defendants' motions to dismiss the § 1983 claim should be granted on this basis alone. In the interest of judicial economy, the other bases for dismissal of the plaintiff's § 1983 claim will not be addressed herein.

**Section 1985 Conspiracy Claim.** The court further finds that the plaintiff has failed to state a claim under § 1985. Plaintiff's allegations in the Amended Complaint do not support a claim under § 1985(1) (preventing officer from performing duties) or § 1985(2) (obstructing justice; intimidating party, witness, or juror). While plaintiff may be attempting to assert a claim under § 1985(3), which creates a claim against persons who conspire to deprive a person or class of persons equal protection or privileges, see Bisbee v. Bey, 39 F.3d 1096, 1102 (10th Cir. 1994), he has failed to allege the requisite elements of such a claim. Those four elements are: (1) a conspiracy; (2) for the purpose of depriving, directly or indirectly, an person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) the conspirators committed some act in furtherance of the conspiracy; and (4) the plaintiff was either injured in his person or property or was deprived of having and exercising any right or privilege

of a citizen of the United States. See Griffin v. Breckenridge, 403 U.S. 88, 103-04 (1971). In addition, the United States Supreme Court has stated that a violation of § 1985(3) requires "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." United Brothers of Carpenters & Joiners of Am. v. Scott, 463 U.S. 825, 834 (1983). See Griffin, 403 U.S. at 101-02 (section 1985(3) does not "apply to all tortious, conspiratorial interferences with the rights of others" but rather, only to conspiracies motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus"); McCoy v. Colorado Dep't of Human Servs. 2015 WL 1064282, at *6 (D. Colo. Mar. 9, 2015) (Section 1985(3) only applies to conspiracies motivated by some class-based invidiously discriminatory animus.). Here, plaintiff makes conclusory allegations of a conspiracy among the defendants, but he has not alleged any specific facts showing agreement and concerted action among them, nor has he alleged that they were motivated by a racial or otherwise class-based invidiously discriminatory animus. Therefore, plaintiff's § 1985 claim should also be dismissed.

**WHEREFORE,** for the foregoing reasons, it is hereby

**RECOMMENDED** that Defendant Germano's Motion to Dismiss Plaintiff's Amended Complaint and Jury Demand (Doc. 30) Pursuant to Fed.R.Civ.P. 12(b)(6) (Docket No. 38) and the City Defendants' Motion to Dismiss First Amended Complaint (Docket No. 39) be **granted**.

**NOTICE: Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b)(2),**

18

**the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case.  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  The District Judge need not consider frivolous, conclusive, or general objections.  A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge, Thomas v. Arn, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions. Makin v. Colorado Dep't of Corrections, 183 F.3d 1205, 1210 (10th Cir. 1999); Talley v. Hesse, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**

Dated: April 10, 2015                   s/ Michael J. Watanabe
         Denver, Colorado               Michael J. Watanabe
                                        United States Magistrate Judge